IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

AMANDA CROSBY,                         *
                                       *
          Plaintiff,                   *
                                       *
             v.                        *          CV 212-140
                                       *
TOMMY J. GREGORY, in his               *
official capacity as Sheriff           *
of Camden County,                      *
                                       *
          Defendant.                   *

---

O R D E R

---

This is a pregnancy discrimination and retaliation case. Presently pending before the Court is Tommy J. Gregory's ("Sheriff Gregory" or "Defendant") Motion for Summary Judgment. (Doc. no. 37.) As explained below, Plaintiff has not presented sufficient circumstantial evidence for a trier of fact to infer that she was terminated because of her pregnancy and has failed to establish any causal connection between the revocation of her law enforcement officer certification and statutorily protected activity. Accordingly, the pending motion is **GRANTED**.


## I. BACKGROUND

### A. Plaintiff's Employment History

This action arises from Plaintiff's employment at the Camden County Sheriff's Office ("Sheriff's Office"). In March 1998, Plaintiff was hired by former Sheriff Bill Smith as office

personnel. (Crosby Dep. at 8.) In June 1998, she was assigned to the jail as a corrections officer. (Id.) She remained in that position until May 2004, when she was reassigned as a deputy handling courthouse security.[1] (Id. at 8, 10; Crosby Decl. ¶ 2.) In February or March 2005, Plaintiff was promoted from deputy to sergeant and assumed a supervisory role. (Crosby Dep. at 10.) In August 2006, Plaintiff left the Sheriff's Office to work at the Camden County Road Department. (Id. at 10-11; Crosby Decl. ¶¶ 2, 4.)

Shortly after Defendant became Sheriff of Camden County, in January 2009, he recruited Plaintiff to return to the Sheriff's Office as the sergeant supervising courthouse security. (Crosby Decl. ¶ 4.) In this capacity, Plaintiff supervised nine courthouse deputies, including Jim Proctor, Lee Dyals, Roger Dyals, Paul Tasciotti, Deborah Young, William Argo, Thomas Flanders, and Frank Thomas.[2] (Id.; Crosby Dep. at 12, 87.) Plaintiff remained in her role as sergeant and supervisor of courthouse security until her termination. Aside from the audio recording that allegedly led to her termination, Plaintiff was never counseled about any job performance issues during her employment at the Sheriff's Office. (Crosby Decl. ¶ 14.) She received no reprimands or complaints during her service. (Crosby Dep. at 41.)

---

[1] In 2000, Plaintiff became certified as a police officer. (Crosby Decl. ¶ 3.)

[2] Informally, Jim Proctor was Plaintiff's second-in-command and handled her duties while she was away. (Crosby Dep. at 12.)

## B. Plaintiff's Pregnancy

In April 2010, Plaintiff learned that she was pregnant. (Crosby Dep. at 17-19.) During her second trimester, Plaintiff informed one of her supervisors, Captain Christoforo, and some of her deputies about her pregnancy. (Id. at 17-18.) Around September or October 2010, Plaintiff submitted a request for leave under the Family and Medical Leave Act ("FMLA") to her other supervisor, Lori Whitlow. (Id. at 19.) Plaintiff was granted twelve weeks of maternity leave, which was scheduled from November 18, 2010 through February 14, 2011. (Id. at 16.) Plaintiff's due date was November 29, 2010. (Id. at 17.) Her son, however, was born premature and treated in a neonatal intensive care unit by multiple specialists for three weeks. (Crosby Decl. at 3.)

According to Plaintiff, her son had a doctor's appointment on February 14, 2011, and Plaintiff received permission from Lori Whitlow to extend her return date to February 17, 2011. (Crosby Dep. at 16, 21-22.) The payroll and leave documents indicate that Plaintiff returned to work on Monday, February 14, but took sick leave for her son's doctor appointment on Tuesday, February 15. (Id., Ex. 2 at 85, 87-89.) Further, she took sick leave on Wednesday February 16 because she had a stomach bug; worked Thursday, February 17; and took sick leave on Friday, February 18 because she scheduled a doctor's appointment for

herself.[3]  (Id.)  She worked most of the following two weeks, except that she took off Monday, February 28, 2011 because her son had a doctor's appointment in Jacksonville, Florida.  (Id., Ex. 2 at 90-91.)

Plaintiff never spoke with Sheriff Gregory about her pregnancy and was never told by anyone that he made negative comments about her pregnancy.  (Id. at 19.)  Plaintiff was never directly discouraged from taking FMLA leave for her pregnancy. (Id. at 35-36.)

### C. Audio Recording and Plaintiff's Termination

On March 4, 2011, Deputy Paul Tasciotti brought a digital voice recorder to Sheriff Gregory and said, "You need to listen to that."  (Gregory Dep. at 26-27; Pl.'s Ex. 3.)  According to Sheriff Gregory, he listened to the recording and decided to terminate Plaintiff based on what he heard.  (Gregory Dep. at 7, 9.)  On March 10, 2011, Sheriff Gregory terminated Plaintiff. (Id. at 26.)  He was the sole decision-maker.  (Id. at 42.)

The primary contents of the recording were an August 17, 2010 conversation made in the jury deliberation room, which was being used as a lunch room at the time.[4]  (Gregory Dep. at 52, 89.)  Paul Tasciotti accidentally recorded the conversation. (Tasciotti Dep. at 25, 29.)  He did not give the recording to

---

[3] The minor discrepancies between Plaintiff's testimony and the leave documents are immaterial.

[4] Plaintiff contends that the audio recording "was made illegally," but cites to no legal authority in support of her position and does not formally object or move to strike or exclude the recording at summary judgment. (Doc. no. 42-1 at 3-4.)  Accordingly, the Court will consider the recording in deciding the pending motion.

Sheriff Gregory until he was accused of "bad-mouthing" Sheriff Gregory, which was in early March 2011. (Id. at 32-33, 51-52, 57.) He believed that Plaintiff was responsible for this accusation. (Id. at 59-60.)

The conversation, which has been transcribed, was between Plaintiff and two of her subordinate deputies: Jim Proctor William Argo.[5] (See generally Crosby Dep., Ex. 3 "Transcript".) Jack Hodge, Deborah Young, Paul Tasciotti, and Roger Dyals were also present but made relatively few comments. (See id.; Tasciotti Dep. at 55.) Trevaughn Myers and Ann Dubose, who were facilities personnel not employed by the Sheriff's Office, were also present. (Crosby Dep. at 44-45.)

In the conversation, Plaintiff and the deputies used profane language. (See, e.g., Transcript at 2-5, 11-16.) Plaintiff admittedly cursed and criticized Sherriff Gregory and openly questioned his competence in front of her subordinates. (Crosby Dep. at 74-45.) For example, she stated: "I don't speak to him [Sheriff Gregory] no more. . . . I don't give a damn. F--- him. I'm tired of his sh--. . . . I ain't going to waste my damn breath." (Transcript at 5; Crosby Dep. at 61-62.) In discussing whether Sheriff Gregory ever attended the FBI Academy, she said: "No. His fat a--, he ain't went to no academy, no FBI Academy. Please." (Transcript at 33.) She told Jim Proctor to tell Sheriff Gregory how to build a new jail

---

[5] Sheriff Gregory and Lori Whitlow helped identify the voices for the transcript. (Gregory Dep. at 24; Whitlow Dep. at 47, 53.)

"so that way in 2012 you have it the way you want it. Don't build no f---ed-up looking jail that we don't want. Need to go over there and tell him what you want built." (Id. at 32.) Plaintiff also stated that Sheriff Gregory was "good at telling everybody's business." (Id. at 10.)

Plaintiff also allowed the following derogatory comments to be made regarding another deputy:

> Deputy Roger Dyals: Did you say Fontanez is fixing to get his master's degree or something?
> . . .
> Deputy Jim Proctor: Yeah, he's working on his masters.
> Sergeant Amanda Crosby: For what?
> Deputy Jim Proctor: Criminal Justice.
> Sergeant Amanda Crosby: Really? Never seen that one.
> Deputy Jim Proctor: Hell, I didn't even know the son-of-a-bi--- could read and write.
> Mr. Trevaughn Myers: In Spanish.
> Sergeant Amanda Crosby: Cubirican.
> Deputy Jim Proctor: Cubirican and sh--.

(Id. at 34.)[6] Likewise, Crosby participated in and did not reprimand her subordinates for making the following comments about a fellow deputy's sexuality and private life:

> Deputy Jim Proctor: I thought Kizzy was a carpet muncher.
> Sergeant Amanda Crosby: She got a son that's like 17 or so.
> Mr. Trevaughn Myers: Mmmmm, man.
> Deputy Jim Proctor: She ain't no carpet muncher?
> Sergeant Amanda Crosby: She's bisexual.
> . . .
> Deputy Jack Hodge: Her partner is the other way. He does both.
> Sergeant Amanda Crosby: Her husband caught her. That's

---

[6] Plaintiff disputes that she was the person who said "Cubirican." (Crosby Dep. at 81.) For the purpose of the summary judgment motion, the Court accepts Plaintiff's version as true and attributes the comment to an unknown speaker but notes that Plaintiff took no corrective action to discourage the potentially discriminatory remark.

why they got divorced. Uh-huh. That sh-- come out in court up here.

(Id. at 22-23.) Plaintiff made additional comments cursing, criticizing, demeaning, and gossiping about other Sheriff's Office employees.[7] (See, e.g., id. at 7, 10-11, 15-16, 21, 33, 35-38, 43.)

Sheriff Gregory testified that he decided to terminate Plaintiff after listening to the recording. He repeatedly stated that the decision to terminate Plaintiff was based solely upon the contents of the recorded conversation. (Gregory Dep. at 7-9, 13-14, 34, 73.) On March 10, 2011, just a few days after listening to the recording, Sheriff Gregory called Plaintiff into his office, listened to the tape with her, and fired her. (Id. at 26-27; Whitlow Dep. at 50.) He gave Plaintiff a letter explaining her termination. (Pl.'s Ex. 3.) The letter stated:

> These [recorded] conversations prove that you do not possess the necessary qualities that are required of a supervisor within this agency. You chose to actively facilitate an inappropriate conversation with your subordinates, as well as an employee from the County's Maintenance Department. This type of conversation, as well as the information you chose to share, undermines the values and vision of our agency. Due to the fact that you have been placed in a position of leadership and influence and chose to willingly facilitate this type of conversation, your services are no longer required. Your termination is effective immediately.

---

[7] Plaintiff also failed to reprimand her subordinates after they discussed urinating on and having intercourse with another supervisor. (Transcript at 12.)

(Id.)  Plaintiff responded with a letter seeking reconsideration because she believed that termination was too harsh a disciplinary action.  (Id.)  Sheriff Gregory replied by letter and explained why he thought termination was appropriate:

1. You openly and willingly disrespected the Sheriff and allowed your subordinates to do the same.
2. You openly and willingly degraded other Sheriff's Office employees in front of your subordinates and allowed them to do the same.
3. As a supervisor and a member of management, you actively, openly, and willingly undermined the values and vision of our agency.
4. You purposely disclosed privileged information you learned in a protected court hearing about other employee's personal matters and allowed subordinates to do the same.
5. You intentionally told untruths to your subordinates about the Sheriff and other employees of our agency.
6. You actively talked about protected areas like sexual preference and allowed racial comments to be made by your subordinates without immediately stopping it and correcting them.
7. You insisted that one of your subordinates cuss out the Sheriff and have that same subordinate tell the Sheriff what kind of jail to build and that he was going the [sic] be the new Sheriff in 2012.
8. All of the above are examples of the environment you actively created on a day to day basis and allowed your subordinates to actively follow your lead to discredit and undermine the effectiveness of our agency.

   The above reasons are but a few that have been considered and now reconsidered regarding your termination on March 10, 2011.

(Id.)

The personnel status change form indicated that Plaintiff was terminated for "Conduct Unbecoming of an Officer" and "Public Criticism" while being a supervisor.  (Pl.'s Ex. 5.)

The Sheriff's Office Standard Operating Procedures ("SOP") include Employee Rules of Conduct, which state:

> 2. UNBECOMING CONDUCT: Employees shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the agency. Conduct unbecoming shall include that which tends to discredit or cause the public to loose [sic] confidence in the agency or Camden County government; which is prejudicial to good order; OR that otherwise intends to impair the operation, efficiency, and/or morale of the agency.

(Pl.'s Ex. 6.) Other examples of prohibited conduct include "[b]oisterous or disruptive activity in the work place" and "[u]nauthorized disclosure of confidential information." (Id.) The "[f]irst recommended action" for a violation is "[o]pen recommendation." (Id.)

> 30. PUBLIC CRITICISM: Complaints regarding agency operations or employees should be resolved by using the employee's chain of command [or other formal procedures]. Under no circumstances shall an employee of the agency publicly criticize the policies, operations or staff[:] by disclosing confidential or protected information OR by using defamatory, vulgar, obscene, libelous, slanderous, or otherwise unlawful or untruthful speech. Nor shall employees engage in criticism that is not considered in the public's interest OR that tends to impair the operation of the agency by reducing organizational efficiency and discipline; by undermining the authority of supervisors; by threatening the harmonious working relationships between employees; or by otherwise disrupting agency's normal operational routine.
>
> First recommended action: Written Reprimand

(Pl.'s Ex. 7.) The SOP also recommends a written reprimand for failure to supervise assigned employees. (Gregory Dep., Ex. 2.)

In his deposition, Sheriff Gregory further explained his reasoning for firing Plaintiff. His deposition testimony is remarkably consistent with the reasons provided in the termination letters and the SOP.[8] (See Gregory Dep. at 7-8, 13-14, 68, 71-74, 78-79, 86-87.)

As to the other deputies involved in the August 17, 2010 conversation, they were required to meet with Sheriff Gregory and received verbal reprimands. (Gregory Dep. at 67-71; Whitlow Dep. at 48-50, 57.) Further, Jim Proctor was reassigned to juvenile court, though his salary was not reduced.[9] (Gregory Dep. at 67-71.) Additionally, at the request of a judge in the courthouse, Sheriff Gregory terminated Paul Tasciotti for making the secret recording. (Gregory Dep. at 66; Tasciotti Dep. at 40-44, 46.) Sheriff Gregory explained that he punished Plaintiff more severely that the other participants because she was the supervisor. (Gregory Dep. at 71; see also Pl.'s Ex. 3.)

## F. Procedural History

On August 9, 2012, Plaintiff filed suit in this Court. Shortly thereafter, the case was reassigned to the undersigned.

---

[8] The only weakness exposed during Sheriff Gregory's deposition is negligible. The termination reconsideration letter alleged that Plaintiff "disclosed privileged information [she] learned in a protected court hearing about other employee's personal matters." When asked about this statement, Sheriff Gregory indicated that it referred to the information Plaintiff disclosed about Kizzy Knight's sexuality and affair that came to light in a divorce proceeding. (Gregory Dep. at 80-82.) Sheriff Gregory conceded that he did not know if the divorce hearing was closed or open to the public or whether the information was "privileged" under applicable law. (Id. at 81-83.) Nevertheless, he still believed that that bailiffs and deputies should not be disclosing that type of information. (Id.)

[9] Jim Proctor still filled in from time to time providing courthouse security. (Gregory Dep. at 69-71.)

On June 14, 2013, the Court dismissed the Camden County Sheriff's Department from this case. (Doc. no. 22.) On June 28, 2013, the Court granted Plaintiff's motion for leave to amend and withdraw claims against the Camden County Board of Commissioners. (Doc. no. 28.) On July 8, 2013, Plaintiff filed a Second Amended Complaint that also withdrew the claims against Sheriff Gregory in his individual capacity. (Doc. no. 29.) Consequently, the Court denied as moot Sheriff Gregory's motion to dismiss the individual capacity claims. (Doc. no. 30.)

In the Second Amended Complaint, Plaintiff asserts claims against Sheriff Gregory in his official capacity for: (1) gender discrimination under the Pregnancy Discrimination Act ("PDA"), (2) retaliation under the PDA, (3) retaliation under the FMLA, and (4) equitable relief. (Second Am. Compl. ¶¶ 15-32.) Sheriff Gregory moves for summary judgment on all these claims. (Doc. no. 37.) The motion is briefed and ripe for consideration.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must

view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per

12

curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave Plaintiff notice of the motion for summary judgment and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 38.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.

## III. DISCUSSION

### A. Pregnancy Discrimination

"Title VII prohibits employment discrimination on the basis of sex." Holland v. Gee, 677 F.3d 1047, 1054 (11th Cir. 2012) (citing 42 U.S.C. § 2000e-2(a)). "The Pregnancy Discrimination Act amended Title VII to provide that discrimination on the basis of sex includes discrimination 'on the basis of pregnancy, childbirth or related medical conditions.'" Id. (quoting 42 U.S.C. § 2000e(k)). "The analysis for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits." Id. at 1054-55 (quotation omitted). "Under Title VII, a plaintiff may prevail on a claim by showing that her pregnancy 'was a motivating factor' for an employment decision." Id. at 1055 (quoting 42 U.S.C. § 2000e-2(m)).

"To prove this, a plaintiff may offer either direct evidence or circumstantial evidence." Id. In the absence of direct evidence, as is the case here, Plaintiff's claims are subject to the burden-shifting framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). Holland, 677 F.3d at 1055. Under the McDonnell Douglas framework, the plaintiff has the initial burden to prove a prima facie case of discrimination by a preponderance of the evidence. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If the plaintiff succeeds in proving a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. Id. at 253. Once the employer proffers a nondiscriminatory reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's reason was pretext for discrimination. Id.

### 1. Traditional Prima Facie Case

"Under McDonnell Douglas, the plaintiff must initially establish a prima facie case, which generally consists of the following: (1) the plaintiff was a member of a protected class, (2) she was qualified to do the job, (3) she was subjected to an adverse employment action, and (4) similarly situated employees outside of the protected class were treated differently." Holland, 677 F.3d at 1055. This formula is flexible and may be

varied to fit a particular employment situation. <u>Paul v. Americold Logistics, LLC</u>, 450 Fed. Appx. 850, 852 (11th Cir. 2012). Sheriff Gregory disputes the first and fourth elements, but not the second and third elements. (Doc. no. 37-1 at 8-9.)

First, Sheriff Gregory argues that Plaintiff was not a member of the protected class because she was no longer affected by pregnancy, childbirth, or related medical conditions at the time of her termination. (<u>Id.</u> at 9.) Given that Plaintiff prematurely gave birth in November 2010 and missed work in late February 2011 to take her son to doctor's appointments, the Court will assume without deciding that Plaintiff was still "affected by pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000e(k), at the time of her March 10, 2011 termination. <u>Cf.</u> <u>Solomen v. Redwood Advisory Co.</u>, 183 F. Supp. 2d 748, 753-55 (E.D. Pa. 2002) (concluding that plaintiff did not show that effects of pregnancy continued to exist eleven months after giving birth).

Second, Sheriff Gregory argues that Plaintiff has not identified any similarly situated employees outside of her protected class who were treated differently. As Plaintiff was the only supervisor in charge of courthouse security, Sheriff Gregory argues that Plaintiff has not shown that any similarly situated *supervisor* was treated differently. (Doc. no. 37-1 at 10-11.) Of those who participated in the inappropriate

conversation on August 17, 2010, only Plaintiff was terminated. However, it is undisputed that Plaintiff was the only formal supervisor in that group. That distinction is significant. "Although [Plaintiff] pointed to certain preferentially treated [non-pregnant] employees in non-supervisory positions, [she] failed to identify a more favorably treated [non-pregnant] supervisory employee." See Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1326 (11th Cir. 2011).

> Differences in job ranks are not, in and of themselves, dispositive as to whether the two individuals may be compared for the purposes of evaluating a discrimination claim, but they can matter. This is because the relevant inquiry is whether the employer subjected differently ranked employees to the same or different employment policies. If the same policies were applied differently to similarly ranked employees, those employees may be compared.

Id. (citations and quotations omitted); see also Burney v. Rheem Mfg. Co., 196 F.R.D. 659, 680 (M.D. Ala. 2000) ("To be deemed 'similarly-situated,' the individual with whom the plaintiff seeks to compare [his] treatment must . . . have been subject to the same standards.").

Here, the record indicates that supervisors had additional responsibilities and could be subject to additional discipline for failing to supervise. The Sheriff's Office SOP states that supervisors are prohibited from "[f]ailing to supervise assigned employees in compliance with agency rules, orders, directives, and policies;" "[n]ot initiating complaint procedures or

notifying superiors when required or when appropriate;" and
"[f]ailing to take other appropriate action necessitated by the
situation, by agency directives, or that is otherwise required
by duty (nonfeasance)."[10]   (Gregory Dep., Ex. 2.)   Accordingly,
it is inappropriate to compare Plaintiff to the subordinate
deputies who participated in the inappropriate conversation.
See Smith, 644 F.3d at 1326-28 (plaintiff's attempt to use non-
supervisors as comparators could not yield presumption of
discrimination under McDonnell Douglas framework because
employer's policy "required supervisors to undertake a more
proactive role than non-supervisors").

### 2. Non-Comparator Circumstantial Evidence

However, "failure to produce a comparator does not
necessarily doom the plaintiff's case." Id. at 1328.   Even
where the plaintiff fails to produce a proper comparator, she
will prevail at summary judgment if she can show enough non-
comparator circumstantial evidence to raise a reasonable
inference of intentional discrimination.   See Hamilton v.
Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir.
2012).   In such a case, "[a] triable issue of fact exists if the
record, viewed in a light most favorable to the plaintiff,

---

[10] Indeed, both at the time of Plaintiff's termination and at his
deposition, Sheriff Gregory explained that he punished Plaintiff more harshly
than her subordinate deputies because she was the supervisor. (Pl.'s Ex. 3;
Gregory Dep. at 71 (indicating that he terminated Plaintiff instead of merely
transferring her "because of the totality of what transpired in there and her
being my supervisor with the duties to supervise, [she] should have shut that
thing down from the get-go. She was the supervisor that day.")

presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" [11] Smith, 644 F.3d at 1328. As outlined below, Plaintiff's circumstantial evidence falls considerably short of this standard.

### a. Timing of Termination

First, Plaintiff believes that she was terminated on the basis of her pregnancy because she "had just returned from maternity leave" and did not have any negative disciplinary history prior to the audio recording incident. (Crosby Dep. at 24-25.) She argues that her termination on the basis of the audio recording is "suspect" because the recording "suddenly surfaced" seven months after it was recorded. (Doc. no. 42-1 at 3, 9.) However, there is uncontroverted testimony that Sheriff Gregory was unaware of the recording until just a few days before terminating Plaintiff. (Gregory Dep. at 26-27; see also Pl.'s Ex. 3.) Paul Tasciotti did not inform Sheriff Gregory

---

[11] The Court acknowledges that Sheriff Gregory advocates for a restrictive view of the Smith decision that does not completely abrogate the McDonnell Douglas burden-shifting framework. (Doc. no. 44 at 9-11.) Further, two district courts in this circuit have taken a similar position. See King v. Ferguson Enterprises, Inc., 971 F. Supp. 2d 1200, 1216 (N.D. Ga. 2013); Bell v. Crowne Mgmt., LLC, 844 F. Supp. 2d 1222, 1231-34 (S.D. Ala. 2012). Yet, that view appears to be foreclosed by the Eleventh Circuit's own interpretation of Smith. In a subsequent decision, the Eleventh Circuit stated: "There is more than one way to show discriminatory intent using indirect or circumstantial evidence. One way is through the burden-shifting framework set out in [McDonnell Douglas] and [Burdine]. Another way is 'present[ing] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" Hamilton, 680 F.3d at 1320 (quoting Smith, 644 F.3d at 1328). Regardless of any purported tension in the caselaw, the Court need not take a position on the issue because - even under the more expansive interpretation of Smith - Plaintiff ultimately fails to present sufficient evidence of discriminatory intent.

about the recording until he was himself accused of criticizing the Sheriff in early March 2011. (Tasciotti Dep. at at 32-33, 51-52, 57.) Under these circumstances, no factfinder could possibly infer discrimination based on the timing of Plaintiff's termination. In fact, the timing actually supports Sheriff Gregory's position.

### b. Alleged Pattern of Prior Pregnancy Discrimination

Second, Plaintiff argues that discriminatory animus may be inferred based on a pattern of past acts of pregnancy discrimination by Sheriff Gregory. (Doc. no. 42-1 at 2, 9, 11.) Sheriff Gregory argues that these allegations have "no effect and relevance" to Plaintiff's claims.[12] (Doc. no. 44 at 14.) This type of "me too" evidence can be admissible, under Rule 404(b), to prove the intent of the employer where, as here, the same supervisor is implicated. See Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1286 (11th Cir. 2008). However, even where the same decision-maker is implicated, "courts are reluctant to consider 'prior bad acts' in this [employment discrimination] context where those acts do not relate directly to the plaintiffs." Denney v. City of Albany, 247 F.3d 1172, 1189 (11th Cir. 2001). Distinctions between the prior bad acts and the plaintiff's current claims "weigh heavily against" attaching probative value to the prior bad acts. See id. (emphasizing

---

[12] Neither party cites any legal authority to back up their arguments.

that the prior acts of discrimination "concerned a different position," "occurred two years before the decisions at issue," and involved "different applicants and a different selection process"). At the very least, a plaintiff must provide evidentiary details regarding the prior acts of discrimination. "Detailed evidence of discrimination against other employees may aid in a finding of discrimination in a given case. However, a hodgepodge of unproven allegations of discrimination against others does not create an inference that [the plaintiff herself] was discriminated against because of [her] race." Hughes v. City of Lake City, No. 3:12-CV-158, 2014 WL 1293525, at *5 (M.D. Fla. Mar. 28, 2014) (citations omitted); see also Holifield v. Reno, 115 F.3d 1555, 1563 (11th Cir. 1997) (generalized impressions of past discrimination are insufficient to raise an inference of discrimination).

To prove discrimination in this case, Plaintiff attempts to rely on two alleged instances of past discrimination against other Sheriff's Office employees. Plaintiff claims that Brandy Nelson was terminated during maternity leave. (Doc. no. 42-1 at 2 (citing Whitlow Dep. at 131.)) In doing so, Plaintiff misrepresents the record.

> Q. Do you know an employee named Brandy Nelson?
> A. I do.
> Q. Was she terminated?
> A. She was. She was let go, yes.
> Q. Okay. Was she terminated when she was out on maternity leave?

A. No, she was not.
Q. Okay. Was she rehired?
A. Not to my knowledge.

(Whitlow Dep. at 131 (emphasis added)). There is no additional discussion of Brandy Nelson in the remainder of Lori Whitlow's deposition, and Plaintiff has not cited any other evidence relating to Brandy Nelson's termination. Plaintiff also claims that Shaun Taylor was subject to pregnancy discrimination. According to Plaintiff, Shaun Taylor "believes" he was terminated "because his wife had a baby and he asked for leave." (Crosby Dep. at 37-38.) Shaun Taylor did not explain to Plaintiff why he thought the termination was discriminatory; he just asked for her lawyer's name and number. (Id. at 38.) The only fact plausibly suggesting discrimination against Shaun Taylor is that he was terminated "right after" requesting leave to help take care of his wife's baby. (Crosby Decl. ¶ 6.) No other factual details are provided relating to Shaun Taylor's termination.

In sum, the level of factual detail provided regarding these two alleged acts of prior pregnancy discrimination is practically nonexistent. No rational trier of fact could infer discrimination on these grounds. See Bell, 844 F. Supp. 2d at 1236-37 (determining that "the 'me, too' evidence offered by the plaintiff and her witnesses is woefully inadequate to compensate for her failure to identify a proper comparator" where the

plaintiff provided "no details" and "no specifics" regarding allegations of past discrimination).

### c. *Stray Remark*

Plaintiff also relies on a remark by Sheriff Gregory regarding another employee's pregnancy leave. Plaintiff did not believe that Sheriff Gregory would like the fact that she was taking twelve weeks of maternity leave because he "made a comment about Candace Thigpen taking so much time off when she had her baby." (Crosby Dep. at 35.) Plaintiff perceived the comment as "negative." (Crosby Decl. ¶ 6.) Plaintiff does not recall when the comment was made, except that it was before Ms. Thigpen's maternity leave. (Crosby Dep. at 35.)

Discriminatory remarks "are probative if they illustrate the decision-maker's state of mind at the time that he made the challenged employment decision." Aristyld v. City of Lauderhill, 543 Fed. Appx. 905, 908 (11th Cir. 2013) (citing Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1362, (11th Cir. 1999)). In Damon, the relevant decision-maker stated that he "wanted 'aggressive, *young* men' like himself to be promoted" just three months after terminating the plaintiff and immediately after terminating a similarly situated member of plaintiff's protected class. 196 F.3d at 1362-63. There was also evidence that the decision-maker engaged in a "pattern of demoting and firing numerous older managers in favor of younger

replacements" during a one-year time period. Id. at 1361, 1364-65. Looking at the "totality of this evidence," the Eleventh Circuit determined that summary judgment was inappropriate. Id. at 1364-65.

On the other hand, a stray discriminatory remark – "isolated and unrelated to the challenged employment decision" – "can *contribute* to a circumstantial case," but "alone, is insufficient to establish a material fact on pretext." See Rojas v. Florida, 285 F.3d 1339, 1342-43 (11th Cir. 2002) (supervisor's statement that another employee – in a higher-ranking position than plaintiff – did not deserve her job because she was a woman was insufficient to establish a genuine factual dispute as to the plaintiff's gender discrimination claim); see also EEOC v. TBC Corp., 889 F. Supp. 2d 1368, 1381 (S.D. Ga. 2012) ("[A] discriminatory comment, taken alone, is not enough to present a question of material fact on the issue of discriminatory intent."), aff'd on other grounds, 532 Fed. Appx. 901 (11th Cir. 2013).

Here, Sheriff Gregory's remark (as recounted by Plaintiff) is plausibly discriminatory but is isolated and relates to another employee, Candace Thigpen. Plaintiff has failed to identify both (1) the rank or position held by Ms. Thigpen, and (2) when the comment was made in relation to Plaintiff's maternity leave and termination. The remark might contribute to

a circumstantial case of discrimination, but is insufficient by itself to take this case to a jury.

### d. *Alleged Violation of Sheriff's Office SOP*

Plaintiff argues that Sheriff Gregory "did not follow the [Sheriff's Office SOP] on any of the discipline issued." (Doc. no. 42-1 at 11.) This position is premised on a series of feeble arguments. For example, Plaintiff contends that Plaintiff's involvement in the August 17, 2010 conversation did not constitute "Public Criticism" under the SOP because the Plaintiff had a "legitimate expectation of privacy" in the break room. (Id. at 5-6.) The Court disagrees. Two non-Sheriff's Office personnel were present in the break room, and one of the two participated in the conversation. Moreover, the actual language of the "Public Criticism" provision is articulated in a broad manner that clearly encapsulates Plaintiff's comments disparaging Sheriff Gregory and other employees. (See Pl.'s Ex. 7 ("Complaints regarding agency operations or employees should be resolved by using the employee's chain of command [or other formal procedures]. . . . Nor shall employees engage in criticism that is not considered in the public's interest OR that tends to impair the operation of the agency by reducing organizational efficiency and discipline; by undermining the authority of supervisors; by threatening the harmonious working relationships between employees; or by otherwise disrupting the

agency's normal operational routine.")). Notably, Plaintiff makes no attempt to explain why her conduct did not fall within the "Unbecoming Conduct" provision. (See Pl.'s Ex. 6 ("Employees shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the agency. Conduct unbecoming shall include that which . . . otherwise intends to impair the operation, efficiency, and/or morale of the agency.") Furthermore, Sheriff Gregory's two letters explaining Plaintiff's termination and deposition testimony explaining her termination are materially consistent. (Compare Pl.'s Ex. 3, with Gregory Dep. at 7-8, 13-14, 68, 71-74, 78-79, 81-83, 86-87.)

Plaintiff complains that Sheriff Gregory "could have issued a reprimand, a suspension, or a demotion for Plaintiff rather than termination." (Doc. no. 42-1 at 5, 9; Doc. no. 45 at 7.) The "first recommended action" for a violation of the Public Criticism provision is issuing a written reprimand. (Pl.'s Ex. 7.) There is an "open recommendation" for any violation of the Unbecoming Conduct provision. (Pl.'s Ex. 6.) Plaintiff concedes that Sheriff Gregory "had discretion as to what discipline to issue Plaintiff." (Doc. no. 42-1 at 5.) "[W]hen an employer has established a progressive discipline policy, a plaintiff may establish pretext by showing that the policy was not followed in [her] case. Nevertheless, if management has

discretion as to whether to follow the discipline policy, then a failure to follow the policy does not show pretext." Ritchie v. Indus. Steel, Inc., 426 Fed. Appx. 867, 873 (11th Cir. 2011) (citations omitted). Here, Sheriff Gregory had discretion to follow the "recommended" disciplinary actions in the Sheriff's Office SOP. Thus, his decision to use the harshest discipline available does not raise any inference of pretext or discriminatory intent. Moreover, Sheriff Gregory explained that he chose termination in part because of the sheer number of infractions committed by Plaintiff during the August 17, 2010 conversation. (Gregory Dep. at 13-14.) And, although Plaintiff further complains that she was disciplined much more harshly than her subordinates who participated in the conversation, Sheriff Gregory explained that he chose to do so because of Plaintiff's additional supervisory responsibilities. (Id. at 71, 78-79.) Plaintiff has not discredited this explanation.

Plaintiff also states that the "secret recording violated [the Sheriff's Office SOP]." (Doc. no. 45 at 7.) Plaintiff has not provided the actual SOP provision addressing this issue, but cites to Sheriff Gregory's testimony that unauthorized secret recordings were against policy. (See Gregory Dep. at 30-31, 60-61.) Even assuming that Paul Tasciotti violated this policy by accidentally making the recording, Plaintiff has not shown that Sheriff Gregory violated the policy by terminating Plaintiff

after listening the recording. Indeed, Sheriff Gregory testified that he did not determine that the recording violated policy until after he listened to it. (Gregory Dep. 31.) Further, the person who allegedly violated the secret recording policy, Paul Tasciotti, was eventually terminated by Sheriff Gregory because of the recording. (Tasciotti Dep. at 40-41.) In sum, Plaintiff has not shown any violation of the Sheriff's Office SOP by Sheriff Gregory.

### e. *Totality of the Circumstances*

Even viewing the totality of the circumstantial evidence in the light most favorable to Plaintiff, she has not presented enough evidence to allow a jury to infer that Sheriff Gregory intentionally terminated her because of her pregnancy. Plaintiff has presented no similarly situated comparator outside of her protected class who was treated more favorably. The timing of her termination is not probative at all. The alleged "pattern" of past pregnancy discrimination by Sheriff Gregory is practically nonexistent. And Sheriff Gregory did not actually violate any provision of the Sheriff's Office SOP. Perhaps the "best" evidence presented by Plaintiff is Sheriff Gregory's negative remark about another employee's maternity leave made at an unknown time. Yet, the law of this Circuit is clear that such a stray remark cannot support a finding of discriminatory intent by itself.

In this case, Plaintiff has not presented "a convincing mosaic of circumstantial evidence." Smith, 644 F.3d at 1328. At most, she has presented a smattering of unpainted tiles.[13] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (1986) (citations omitted); see also Matsushita, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). Accordingly, Sheriff Gregory is entitled to summary judgment on the pregnancy discrimination claim.

### B. Retaliation

Plaintiff alleges PDA retaliation[14] and FMLA retaliation. Under the PDA, Plaintiff alleges that Sheriff Gregory

---

[13] Courts applying the "convincing mosaic" framework and concluding that summary judgment was inappropriate have been presented with much more substantial evidence. For example, in Smith, there was no similarly situated supervisor who had distributed racially insensitive emails like the white plaintiff, but there was evidence that (1) the employer terminated white non-supervisors who sent similar emails and more leniently disciplined black non-supervisors who engaged in virtually identical conduct, (2) the employer was faced with significant economic and public-relations pressures to harshly discipline white employees, and (3) the race of each employee who sent insensitive emails was actually listed on the matrix used by the disciplinary review committee to mete out discipline. See 644 F.3d at 1341, 1345-46.

Similarly, in Zottola, this Court found sufficient circumstantial evidence where (1) the plaintiff's supervisor made numerous negative remarks regarding the plaintiff's pregnancies and maternity leave, (2) there was a factual dispute as to whether the plaintiff had actually violated the employer's policy, (3) the employer had failed to enforce the policy provision at issue in the past, and (4) there was a factual dispute as to whether the employer was even made aware of the plaintiff's purported violation of policy prior to deciding to terminate her. See Zottola v. Anesthesia Consultants of Savannah, P.C., No. 4:11-cv-154, Doc. no. 50, at *24-31 (S.D. Ga. March 29, 2013).

[14] The PDA simply "amended Title VII to provide that discrimination on the basis of sex includes discrimination 'on the basis of pregnancy,

"retaliated against Plaintiff after she filed her Charge with the Equal Opportunity Commission by withholding her certification as a Corrections Officer." (Second Am. Compl. ¶ 22.) Under the FMLA, Plaintiff alleges that Sheriff Gregory "terminated Plaintiff from her employment because she took leave pursuant to the FMLA." (Id. ¶ 27.) Defendant moves for summary judgment on both claims. (Doc. no. 37-1 at 14-20.) In her reply briefs, Plaintiff only mentions retaliation predicated on revocation of her Peace Officer Standards and Training Council ("POST") certification.[15] (Doc. no. 42-1 at 11-14; Doc. no. 45 at 5, 10.) Thus, the Court deems that Plaintiff's FMLA claim predicated on retaliatory termination has been abandoned.

The relevant facts are as follows. Within a few weeks of being terminated on March 10, 2011, Plaintiff went to the EEOC to file a charge of discrimination. (Crosby Decl. ¶ 12.) On May 10, 2011, the EEOC notified Plaintiff that her EEOC charge was received. (Pl.'s Ex. 10.) In July 2011, Plaintiff received a notice that she was being investigated by POST because she was terminated by the Sheriff's Office for disciplinary infractions. (Pl.'s Ex. 11.) Apparently, at some earlier point in time, the Sheriff's Office notified POST of Plaintiff's termination and

childbirth or related medical conditions.'" Holland, 677 F.3d at 1054 (quoting 42 U.S.C. § 2000e(k)). Thus, Plaintiff's PDA retaliation claim is substantively a Title VII retaliation claim. The Court will use the Title VII retaliation framework but continue to refer to it as the PDA retaliation claim for ease of reference.

[15] Though Plaintiff does label a section in her response brief as relating to FMLA retaliation, the substance of the brief pertains to the PDA retaliation claim as alleged in the Second Amended Complaint. (See Doc. no. 42-1 at 11-14.) Here, the Court looks to substance, not labels.

recommended that her certification be revoked. (Crosby Dep. at 29, 31-32.) On March 7, 2012, POST revoked Plaintiff's certification. (Pl.'s Ex. 9.) Plaintiff successfully appealed her POST certification revocation but it took her a year to do so. (Crosby Decl. ¶ 18.) After being terminated, Plaintiff applied for various positions but was not hired. (Id. at 16.) One potential employer, the Coastal College of Georgia, informed her that they would not consider her application because she was under investigation by POST. (Crosby Decl. ¶ 17.)

There is a POST rule that requires the Sheriff's Office to notify POST of any officer's disciplinary termination. (Gregory Dep. at 61-62; see also Georgia POST Rule 464-3-.06.) During Sheriff Gregory's tenure, the Sheriff's Office notified POST and recommended revocation of an officer's certification any time an officer was terminated for cause. (Crosby Dep. at 32; Whitlow Dep. at 129-30.) Sheriff Gregory did not himself notify POST that Plaintiff had been terminated and did not personally know that the notification had been sent until the day of his deposition. (Gregory Dep. at 61-62.) It was Captain Christoforo's responsibility to send notices of termination to POST. (Id.)

To establish a prima facie case of retaliation under Title VII, as amended by the PDA, a plaintiff must show that she (1) engaged in a statutorily protected activity, (2) suffered a materially adverse employment action, and (3) that the protected

activity and adverse action were causally connected." Hughes, 2014 WL 1293525, at *6 (citing Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1258 (11th Cir. 2012); Goldsmith, 513 F.3d at 1277)). "Once the plaintiff establishes these elements, the burden shifts to the employer to provide a legitimate, non-retaliatory reason for the adverse action." Id. "If the employer succeeds in this task, the plaintiff then must show that the reason provided is a mere pretext for prohibited retaliatory conduct." Id. "If a claimant cannot show that protected activity was a but-for cause of the employer's alleged adverse action, then the retaliation claim must fail." Wesolowski v. Napolitano, No. 2:11-CV-163, 2014 WL 794963 (S.D. Ga. Feb. 27, 2014) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, --- U.S. ----, 133 S.Ct. 2517, 2534 (2013)).

Plaintiff engaged in protected activity by filing an EEOC charge, and the Court will assume that that she suffered an adverse employment action due to the revocation of her POST certification. However, Plaintiff fails to show a sufficient causal connection between these two events. Plaintiff attempts to prove causation through temporal proximity between her receipt of an EEOC notice acknowledging acceptance of her EEOC charge in early May 2011 and her receipt of the POST notice of investigation in late July 2011. (Doc. no. 42-1 at 13.) Sheriff Gregory responds in part by arguing that there is no

causal connection because all employees' terminations were reported to POST with a recommendation of revoking certification. (Doc. no. 44.) In her sur-reply brief, Plaintiff fails to address this argument and falls back on temporal proximity to establish causation. (Doc. no. 45 at 5, 10.)

"The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000). However, there are exceptions to this rule. First, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." Id. Second, the Eleventh Circuit has held that "when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006); accord Robinson v. United Parcel Serv., Inc., No. 1:06-CV-2601, 2007 WL 3484743 (N.D. Ga. Nov. 14, 2007).

Plaintiff presents no evidence that Sheriff Gregory was aware that Plaintiff had filed an EEOC charge at the time the Sheriff's Office notified POST of her termination. Further, Sheriff Gregory was not even aware of or personally involved in sending the termination notice to POST. Moreover, the record indicates that the Sheriff's Office notified POST and recommended revocation of an officer's certification any time an officer was terminated for cause. In other words, the adverse action was contemplated – as a standard practice – prior to Plaintiff's protected activity. This evidence negates any possible inference of a causal connection between Plaintiff's protected activity and the revocation of her POST certification. Consequently, Plaintiff's retaliation claim fails as a matter of law.

## IV. CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment (doc. no. 37) is **GRANTED**. The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendant. The Clerk shall terminate all deadlines and motions, and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this _10th_ day of September, 2014.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA